United States Court of Appeals, Eleventh Circuit.

No. 95-6198.

REDWING CARRIERS, INC., Plaintiff-Counter-defendant-Appellant,

v.

SARALAND APARTMENTS, Roar Company, Defendants-Counter-claimants-Appellees,

Michael Coit, in his capacity as legal representative of the Estate of Robert Coit, Christopher M. Weil, in his capacity as legal representative of the estate of Robert Coit, Marcrum Management Company, et al., Defendants-Appellees,

Robert Coit, Defendant-Counter-claimant.

Sept. 12, 1996.

Appeal from the United States District Court for the Southern District of Alabama. (No. CV-91-0524-BH-S), William Brevard Hand, Judge.

Before DUBINA and BLACK, Circuit Judges, and MARCUS[*], District Judge.

BLACK, Circuit Judge:

Redwing Carriers, Inc. (Redwing) appeals the district court's grant of summary judgment in favor of Appellees Saraland Apartments, Ltd., Michael Coit and Christopher Weil, Roar Company, Hutton Advantaged Properties Ltd., H/R Special Limited Partnership, Marcrum Management Company and Meador Contracting Company. Redwing sued the Appellees claiming they are liable under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA or "the Act") for response costs Redwing has incurred in cleaning up a Superfund Site in Saraland, Alabama. Redwing argues the district court committed numerous errors in rejecting its CERCLA claims and allocating the entire cost of cleaning up the

[*]Honorable Stanley Marcus, U.S. District Judge for the Southern District of Florida, sitting by designation.

Site to Redwing.  As discussed below, we affirm in part, reverse in part, and remand.

## I. BACKGROUND

The Redwing Carriers, Inc. (Saraland) Site is a 5.1-acre parcel of land located within the southern Alabama community of Saraland.  From 1961 to 1972, Redwing operated a trucking terminal on the property.  Redwing was in the business of hauling materials used in construction and other industries, and trucks passing through the Saraland terminal carried substances such as asphalt, tail oil, and molten sulfur.  At the terminal, trucks were cleaned out, and the waste water permitted to drain onto the property. Redwing built levees on the Site to contain the waste water runoff and dumped excess asphalt directly into pits dug out of the ground. As a result of Redwing's activities, the ground at the Site became contaminated with hazardous chemicals which have combined to form a black, tar-like toxic substance.

In 1971, Redwing sold the Site to Harrington, Inc., which in turn sold the property to Apartments, Inc., later that year.  In March 1973, Saraland Apartments, Ltd. ("Saraland Limited" or "the Partnership") purchased the property from Apartments, Inc.  At the time, Ralph C. Harrington, A.B. Meador, E.L. MacDonald, and W.D. Bolton were partners in Saraland Limited.  The Partnership promptly hired Meador Contracting Company (Meador) to build an apartment complex on the Site.[1]  As part of the construction, Meador had to grade, excavate and fill the ground on the property.  During the

---

[1]A.B. Meador was the president of Meador as well as a general partner in Saraland Limited.

grading and excavating, Meador's subcontractor encountered patches of contaminated soil and deposits of the tar-like substance buried by Redwing. Meador completed construction of the Saraland Apartments complex in May 1974.

Construction of the complex was subsidized by the United States Department of Housing and Urban Development (HUD) to provide low-income housing. In 1980, Saraland Limited hired Marcrum Management Company (Marcrum) as its "management agent" for the property. According to Marcrum, it provides administrative support to the Partnership to assure the Partnership conforms with federal regulations governing HUD-subsidized properties. Marcrum denies Redwing's claim that the company is the daily, on-site manager of the property.

Redwing further alleges that after Marcrum assumed management of Saraland Apartments, two events caused a dispersal of contaminated soil at the Site. In 1986, the complex's parking lot was repaved. In 1991, contractors hired by Marcrum performed maintenance work on an underground gas line on the property. To access the pipeline, workers dug up soil at specific locations along the pipeline.

Saraland Limited first became aware of tar seeping to the surface of the property in 1977. HUD noted tar in several areas of the complex during a July 1983 inspection. In an August 1984 inspection report, HUD again cited tar surfacing in various locations in the complex. By this time, residents of Saraland Apartments had been complaining about tar problems for several years.

In October 1984, a group of investors bought out the original partners in Saraland Limited.  Robert Coit and Roar Company (Roar[2]) purchased a 1% general partnership interest in the Partnership.[3] Hutton Advantaged Properties, Ltd. and H/R Special Limited Partnership (collectively, "the Hutton partners") purchased the remaining 99% interest and became limited partners in Saraland Limited.

Under the amended partnership agreement signed in 1984, Coit and Roar are responsible for managing the business of the Partnership.  The limited partners, however, possess certain rights giving them a measure of control over the Partnership's affairs. For example, H/R Special Partnership may force the Partnership to sell the apartment complex and may veto any proposed sale of the property.  H/R Special Partnership must likewise consent to any extended management contract for the complex or any change in the managing agent.[4]

In 1985, Redwing entered into an "administrative order by consent" with the Environmental Protection Agency (EPA) agreeing to

[2]Robert Coit was the principal officer and shareholder in Roar.

[3]Robert Coit died while this action was pending in the district court, and Michael Coit and Christopher Weil were substituted as representatives of Robert Coit's estate.  We shall refer to Michael Coit and Christopher Weil, in their joint capacity as legal representatives of Robert Coit's estate, as "Coit."

[4]Other notable powers of the Hutton partners include:  (1) H/R Special Partnership must consent to any refinancing or prepayment of the mortgage on Saraland Apartments;  (2) a general partner must obtain the consent of H/R Special Partnership before withdrawing from the Partnership;  and (3) H/R Special Partnership may remove a general partner in certain circumstances.

monitor the Site for tar seeps and to remove any seeps that appeared. Redwing bound itself in a second consent order in July 1990 to perform the remedial investigation/feasibility study for the property. Redwing claims it has spent approximately $1.9 million in investigating and cleaning up the Site.

Redwing filed this suit seeking to recoup these costs. Redwing alleged the Partnership, Coit, Roar, the Hutton partners, Marcrum, and Meador were liable under §§ 113(f) and 107(a) of CERCLA for the costs Redwing has incurred and will incur in the future in cleaning up the Site. Redwing also sought relief under several state law theories. The Partnership, Coit, Roar, and the Hutton partners alleged counterclaims against Redwing for contribution under § 113(f) of CERCLA. These defendants also brought claims under Alabama law seeking recovery from Redwing for property damage caused by Redwing's burial of toxic chemicals on the Site.

In time, Redwing and the Appellees filed cross-motions for summary judgment on the CERCLA and state law claims.[5] With the exception of Redwing's claim against Saraland Limited, the district court denied Redwing's motion for summary judgment on its CERCLA claims. *Redwing Carriers, Inc. v. Saraland Apartments, Ltd.,* 875 F.Supp. 1545, 1555-67 (S.D.Ala.1995). The court granted the other appellees' cross-motions for summary judgment on their liability under CERCLA. *Id.* The Partnership, as the current owner of the

[5]Other than Redwing's claims against the individual partners predicated on partnership law, the parties have not contested the district court's disposition of the state law counts. Accordingly, we will not address these claims.

Site, conceded it was a "covered person" within the meaning of subsection 107(a)(1) of CERCLA and hence potentially responsible for response costs. *Id.* at 1566-67. The district court, however, granted the Partnership's motion for summary judgment on its contribution claim under § 113(f) of CERCLA. *Id.* at 1569. The court then allocated 100% of the response costs to Redwing, thereby absolving the Partnership of any responsibility under CERCLA. *Id.* Redwing appeals the district court's denial of its motion for summary judgment on its CERCLA claims as well as the court's allocation of costs under § 113(f).

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo. Forbus v. Sears Roebuck & Co.,* 30 F.3d 1402, 1404 (11th Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 906, 130 L.Ed.2d 788 (1995). A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Everett v. Napper,* 833 F.2d 1507, 1510 (11th Cir.1987). An issue of fact is "genuine" if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "material" if it might affect the outcome of the case under the governing law. *Id.*

III. DISCUSSION

In its amended complaint, Redwing alleged separate claims against the Appellees under §§ 107(a) and 113(f) of CERCLA, 42 U.S.C. §§ 9607(a) and 9613(f). As a matter of law, however, Redwing's CERCLA claims against the Appellees are claims for contribution governed by § 113(f). To bring a cost recovery action based solely on § 107(a), Redwing would have to be an innocent party to the contamination of the Saraland Site. *See United Technologies Corp. v. Browning-Ferris Indus.*, 33 F.3d 96, 99-100 (1st Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 764 (7th Cir.1994). Redwing cannot claim such innocence. Although Redwing disavowed liability in its consent orders with the EPA, Redwing cannot deny it originally disposed of most, if not all, of the hazardous substances now contaminating the Site. Redwing is a responsible party under CERCLA[6], and therefore, its claims against other allegedly responsible parties are claims for contribution. *See United States v. Colorado & E.R. Co.*, 50 F.3d 1530, 1535-36 (10th Cir.1995); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 672 (5th Cir.1989).

Whether Redwing brings its claims under § 107(a) or § 113(f)

---

[6]Redwing has not denied its liability under CERCLA before this Court. Notably, Redwing has not appealed the liability ruling of the district court's summary judgment in favor of Saraland Ltd., Coit, Roar, and the Hutton partners on their counterclaims under § 113(f). Rather than challenging the district court's finding that the company is a responsible party under CERCLA, Redwing contests the district court's allocation of costs between Redwing and the Appellees.

does not matter insofar as establishing the Appellees' liability.[7] The elements of a claim under both sections are the same. *See* 42 U.S.C. § 9613(f)(1) ("Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) [107(a) ] of this title."). *Compare United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 719-20 (2d Cir.1993) (listing elements of a cost recovery action under § 107(a)) *with Amoco Oil,* 889 F.2d at 668 (listing elements in contribution action brought by one responsible party against another). To prevail on a claim under CERCLA, a plaintiff must demonstrate:

1. the site in question is a "facility" as defined in § 101(9) of CERCLA, 42 U.S.C. § 9601(9);

2. a release or threatened release of a hazardous substance has occurred;

3. the release or threatened release has caused the plaintiff to incur response costs consistent with the "national contingency plan" (NCP)[8]; and

---

[7] The importance of distinguishing between cost recovery actions brought under § 107(a) and contribution claims under § 113(f) will become evident in our discussion of equitable allocation under § 113(f) in section III(E), *infra.* For now, we note a crucial difference between claims brought under these two sections is the nature of liability imposed on defendants. In most cases, a defendant found liable to an innocent plaintiff, *i.e.,* a plaintiff who is not itself liable under CERCLA for cleaning up a site, is held jointly and severally liable under § 107(a) to the plaintiff for all of the plaintiff's response costs. *See Colorado & E.R. Co.,* 50 F.3d at 1535; *Akzo Coatings,* 30 F.3d at 764. In contrast, subsection 113(f)(1) expressly permits courts to allocate response costs among responsible parties—including the plaintiff—in contribution actions between responsible parties. 42 U.S.C. § 9613(f)(1).

[8] The NCP is a body of regulations governing the clean up of hazardous waste sites under CERCLA. *See* 42 U.S.C. § 9605(a); 40 C.F.R. Part 300 (1995).

Courts are split on whether a CERCLA plaintiff must demonstrate consistency with the NCP to obtain a partial summary judgment on a defendant's "liability" under CERCLA.

4. the defendant is a "covered person" under § 107(a) of CERCLA.

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 889 F.2d 1146, 1150 (1st Cir.1989); *Amoco Oil,* 889 F.2d at 668; *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152-53 (9th Cir.1989). The parties do not contest Redwing has established the first three elements. The Saraland Site is a "facility" under CERCLA, and there has been a release of hazardous substances on the property. The Appellees furthermore do not deny Redwing's claim that it has incurred response costs and will continue to incur response costs in the future.

The parties focus their debate on whether some or all of the Appellees are "covered persons" under § 107(a). This section defines four classes of potentially responsible parties:

> 1) the owner and operator of a vessel or a facility,
>
> 2) any person[9] who at the time of disposal of any hazardous substance owned or operated any facility at which

---

*Compare Alcan Aluminum,* 990 F.2d at 720 (stating CERCLA plaintiff entitled to summary judgment on issue of liability, even when genuine issues of fact remain as to appropriate damages) *and Amoco Oil,* 889 F.2d at 668 (same) *with Weyerhaeuser Corp. v. Koppers Co.,* 771 F.Supp. 1406, 1413-14 (D.Md.1991) (reasoning that to establish liability under CERCLA, plaintiff must demonstrate at least some of the costs sought are consistent with the NCP) *and Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1291-92 (D.Del.1987) (reasoning plaintiff must demonstrate consistency with the NCP to obtain partial summary judgment), *aff'd,* 851 F.2d 643 (3d Cir.1988). We need not decide this issue here. The district court did not address NCP consistency, and the parties have not raised the issue on appeal.

[9]CERCLA broadly defines "person" as including an "individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21).

such hazardous substances were disposed of,

  3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

  4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a). This appeal concerns CERCLA's definition of the first three classes of persons.[10]

In its amended complaint, Redwing alleged all of the Appellees except Meador were liable under subsections 107(a)(1), (2), and (3). Redwing alleged Meador was responsible only for having "arranged for" the disposal of hazardous substances at the Site as defined in subsection 107(a)(3). We will review Redwing's arguments regarding each Appellee's liability under these subsections of § 107(a) below.

We pause, however, to address the district court's interpretation of subsection 107(a)(1). This provision imposes liability on any current "owner *and* operator" of a site. *See* 42 U.S.C. § 9607(a)(1) (emphasis supplied). The district court reasoned the phrase "owner and operator" means a defendant could only be liable under this subsection if the defendant was both the owner and the operator of a site. *See Redwing Carriers*, 875 F.Supp. at 1555-56. This conclusion is contrary to the law of this

---

[10]Redwing does not allege any of the Appellees are liable according to subsection 107(a)(4) as parties who transported hazardous substances to the Saraland Site.

Circuit. In *United States v. Fleet Factors Corp.*, 901 F.2d 1550, 1554 n. 3 (11th Cir.1990), *cert. denied,* 498 U.S. 1046, 111 S.Ct. 752, 112 L.Ed.2d 772 (1991), we interpreted the phrase "owner and operator" in subsection 107(a)(1) to be disjunctive, imposing liability on any person who was either the current owner or the current operator of a facility. The district court acknowledged *Fleet Factor* 's reasoning, but suggested this view is not supported by the statutory text and is due to be reconsidered. *See Redwing Carriers,* 875 F.Supp. at 1556. The district court was not free to disregard *Fleet Factor* 's reasoning, and neither are we. Absent a supervening Supreme Court decision or a change in statutory law, we are bound by a prior panel's decision. *Myrick v. Freuhauf Corp.,* 13 F.3d 1516, 1521 (11th Cir.1994), *aff'd,* --- U.S. ----, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995); *United States v. Woodard,* 938 F.2d 1255, 1258 & n. 4 (11th Cir.1991), *cert. denied,* 502 U.S. 1109, 112 S.Ct. 1210, 117 L.Ed.2d 449 (1992). It is therefore settled that a person is a responsible party under subsection 107(a)(1) if they are the current owner *or* operator of a facility.

The parties do not dispute Saraland Limited holds title to the Site. The Partnership thus concedes it is a potentially responsible party under subsection 107(a)(1) as the current owner of the property. The primary question in this appeal is whether Redwing carried its burden on summary judgment of showing any of the other Appellees are also responsible parties under § 107(a).

A. *The Hutton Partners*

Hutton Advantaged Properties, Ltd. and H/R Special Limited Partnership, Ltd. became limited partners in Saraland Limited when

they purchased a 99 percent interest in the Partnership. Citing this interest together with the rights the Hutton partners have under the amended partnership agreement, Redwing argues these limited partners are "owners" and "operators" of the Site within the meaning of § 107(a). Redwing further alleges the Hutton partners are liable for having "arranged for" the disposal of hazardous substances on the property as defined in subsection 107(a)(3). The district court found Redwing's arguments unconvincing, *Redwing Carriers,* 875 F.Supp. at 1556-1559, and we are similarly unpersuaded.

1. *"Owner" Liability.*

Subsection 107(a)(1) imposes liability on the current "owner" of a facility while subsection 107(a)(2) does likewise for parties who in the past "owned" the site at the time a hazardous substance was disposed of at the facility. 42 U.S.C. § 9607(a)(1), (2). "Owner" does not have any special meaning under CERCLA. The statute defines the "owner or operator" of "an onshore facility" as "any person owning or operating such facility." 42 U.S.C. § 9601(20)(A)(ii). This circular definition of "owner or operator" suggests these terms have their ordinary meanings rather than any unusual or technical meaning. *Edward Hines Lumber Co. v. Vulcan Materials Co.,* 861 F.2d 155, 156 (7th Cir.1988).

Redwing essentially argues that given the Hutton partners' stake in Saraland Limited and their power to control the Partnership, they should be deemed "owners" of the Saraland Site under CERCLA. This argument ignores the settled principle that property interests and rights are defined by state law. *Butner v.*

*United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). In the absence of any unique definition of "ownership" in CERCLA, we look to Alabama law to define the ownership interest of the limited partners in the Site.

Title to the Site rests with the Partnership—not the limited partners. Under Alabama's limited partnership statute, a partner's interest in the partnership is personal property. Ala.Code § 10-9A-120 (1994). The Hutton partners' interest in Saraland Limited permits them to share in the profits and losses of the Partnership, as well as receive distributions of the Partnership's assets and any allocation of income, gain, loss, deduction, credit or similar items. *Id.* § 10-9A-1(10). Neither Alabama law nor the amended partnership agreement of 1984 suggests the Hutton partners hold title to the Partnership's assets. Since the limited partners are not owners of the Site under Alabama law, they are not "owners" of the Site within the meaning of § 107(a) of CERCLA.

We reject Redwing's suggestion that limited liability structures such as corporations and limited partnerships are irrelevant in assessing "owner" liability under CERCLA. Nothing in § 107(a) or § 101(20)(A) implies that owner liability can be imposed directly on a limited partner in disregard of the partnership structure established according to state law. If Congress intended for courts to ignore state law defining property interests in assessing CERCLA owner liability, then it would have stated so. Since the statute does not evince such an intent, we will not interpret it in this fashion. *Cf. United States v. USX Corp.,* 68 F.3d 811, 824 (3d Cir.1995) (finding CERCLA's language

"fails to indicate that traditional concepts of limited liability are to be disregarded" and refusing to hold a corporation's shareholders and officers directly liable under subsection 107(a)(4) of CERCLA for the corporation's acts); *Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80, 83 (5th Cir.1990) (noting a similar lack of any intent to extend CERCLA liability directly to a parent corporation based on the liability of its subsidiary), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991).

That the Hutton partners are not owners of the Site under CERCLA does not end our analysis. This only means the limited partners are not *directly* liable under the Act for cleaning up the Site. The question remains whether the Hutton partners, by virtue of their being limited partners in the Partnership, are accountable *indirectly* for the Partnership's CERCLA liability under applicable partnership law. As a general rule, a limited partner is not liable for the obligations of the partnership. *See, e.g.,* Ala.Code § 10-9A-42(a); Cal.Corp.Code § 15632 (West 1996); Fla.Stat.Ann. § 620.129(1) (West 1993). An exception arises when a limited partner acts like a general partner in controlling the partnership's business. In those circumstances, the limited partner may lose its limited liability status and be held to account for the partnership's liability. *See, e.g.,* Ala.Code § 10-9A-42(a); Cal.Corp.Code § 15632; Fla.Stat.Ann. § 620.129(1). The Hutton partners' liability for the Partnership's CERCLA obligations therefore depends on whether they crossed this line in controlling

the business of Saraland Limited.[11]

Neither CERCLA's text nor its legislative history address whether state or federal law governs when a limited partner may be held liable for the partnership's debts.  As several jurists have noted, Congress passed CERCLA in great haste and in the process left many holes in its framework for courts to fill in.  *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 91 (3d Cir.1988), *cert. denied,* 488 U.S. 1029, 109 S.Ct. 837, 102 L.Ed.2d 969 (1989);  *Dedham Water Co. v. Cumberland Farms Dairy, Inc.,* 805 F.2d 1074, 1080 (1st Cir.1986).  One of the more significant gaps in CERCLA's scheme arises where the right to recovery created by the Act confronts state law governing business entities like corporations and partnerships.

Although there is a dearth of authority regarding CERCLA's interaction with state partnership law,[12] courts have been called

---

[11]The district court concluded the question of whether the Hutton partners were liable under partnership law was moot because the Court ultimately allocated all the costs of cleaning up the Site to Redwing.  *Redwing Carriers,* 875 F.Supp. at 1557. Since the district court on remand could arrive at a different allocation of responsibility and assess some costs to the Partnership, it is prudent to address whether the Hutton partners can be held accountable for any CERCLA liability imposed on the Partnership.

[12]The parties have cited, and our research has uncovered, only one reported decision from a federal court addressing a limited partner's liability under CERCLA.  *See Soo Line R. Co. v. B.J. Carney & Co.,* 797 F.Supp. 1472, 1485-86 (D.Minn.1992).  In *Soo Line,* the general and limited partners of a partnership moved to dismiss the plaintiff's claim for imposing joint and several liability against them based on the potential liability of the partnership under CERCLA.  *Id.* at 1485.  The partners contended they were shielded from such liability by state partnership law. *Id.* at 1485-86.  The limited partners in *Soo Line,* as the Hutton partners have in this case, argued they were not liable under state law for any debts of the partnership without having controlled the partnership.  *Id.*  The district court rejected the

upon to resolve issues of CERCLA liability for corporations and their shareholders. For example, courts in CERCLA actions have had to determine when to "pierce the corporate veil" to hold a corporation's shareholders liable, *see United States v. Cordova Chem. Co.,* 59 F.3d 584, 592 (6th Cir.), *reh'g en banc granted and judgment vacated,* 67 F.3d 586 (6th Cir.1995); *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1224-25 (3d Cir.1993), whether a corporation can be held accountable as a "successor" corporation for its predecessor's CERCLA liability, *see Anspec Co. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1244-47 (6th Cir.1991); *Smith Land,* 851 F.2d at 90-92, and whether a dissolved corporation is subject to suit under CERCLA, *see Levin Metals Corp. v. Parr-Richmond Terminal Co.,* 817 F.2d 1448, 1450-51 (9th

---

partners' arguments reasoning:

> [R]esponsible parties may be held jointly and severally liable under CERCLA. Both individuals and partnerships are statutorily defined "persons." ... As a general rule, CERCLA imposes joint and several liability upon responsible persons except where they can show that the harm is divisible.... Accordingly, the Court will let stand the allegations of joint and several liability unless and until the defendants show that the harm is divisible.

*Id.* at 1486 (citations omitted). Given the procedural posture of *Soo Line* and the joint argument of the general and limited partners in that case, we hesitate to read too much into the district court's holding. Still, to the extent the *Soo Line* court rested this particular holding on the premise that CERCLA imposes liability directly on a limited partner merely because the partnership itself is liable, then we must respectfully disagree with this conclusion. Such reasoning ignores the limited liability nature of these partnerships under state law. As explained earlier, nothing in CERCLA suggests we should disregard traditional concepts of limited liability in the corporate and partnership contexts in assessing owner liability under the Act.

Cir.1987); *United States v. Sharon Steel Corp.,* 681 F.Supp. 1492, 1494-98 (D.Utah 1987).  In resolving questions of liability for shareholders, officers and employees of corporations under CERCLA, courts have reached different conclusions on whether state or federal common law provides the rule of decision.  *Compare Anspec Co.,* 922 F.2d at 1248-51 (Kennedy, J., concurring) (reasoning state law governs the issue of corporate successor liability under CERCLA) *with Smith Land,* 851 F.2d at 91-92 (stating federal common law standard should govern successor liability) *and Louisiana-Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260, 1263 (9th Cir.1990) (agreeing with *Smith Land* on this question).

Ultimately, federal law determines the issue of CERCLA liability.  CERCLA is a federal statute targeting a national problem:  the cleanup of hazardous waste sites.  Consequently, the rights and liabilities created by CERCLA are governed by federal law.  *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726-28, 99 S.Ct. 1448, 1457-58, 59 L.Ed.2d 711 (1979); *Clearfield Trust Co. v. United States,* 318 U.S. 363, 366-67, 63 S.Ct. 573, 574-75, 87 L.Ed. 838 (1943).  The Supreme Court has cautioned, however, that controversies governed by federal law "do not inevitably require resort to uniform federal rules."  *Kimbell Foods,* 440 U.S. at 727-28, 99 S.Ct. at 1458 (citing *Clearfield Trust,* 318 U.S. at 367, 63 S.Ct. at 575 and *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 594-95, 93 S.Ct. 2389, 2397-2398, 37 L.Ed.2d 187 (1973)).  Instead, "[w]hether to adopt state law or to fashion a nationwide federal rule is a matter of judicial policy "dependent upon a variety of considerations always relevant

to the nature of the specific governmental interests and to the effects upon them of applying state law.' " *Id.* at 728, 99 S.Ct. at 1458 (quoting *United States v. Standard Oil Co.,* 332 U.S. 301, 310, 67 S.Ct. 1604, 1609, 91 L.Ed. 2067 (1947)).[13]

In *Kimbell Foods,* the Supreme Court fashioned a three-factor test for determining whether, when filling a gap in a federal statute, to craft a uniform common law rule or to adopt the applicable state law rule as the federal standard.  Under the *Kimbell Foods* test, courts must consider:

1. whether there is a need for a nationally uniform body of law to apply in situations like the one before the court;

2.  whether application of the state law rule would frustrate important federal policy;  and

3. the impact a federal common law rule might have on existing relationships under state law.

*Id.* at 728-29, 99 S.Ct. at 1458-59;  *FDIC v. Jenkins,* 888 F.2d

---

[13]Subsection 113(f)(1) of CERCLA states actions for contribution under the statute are "governed by Federal law."  42 U.S.C. § 9613(f)(1).  As explained at the outset, Redwing's CERCLA claims against the Appellees are for contribution and hence controlled by § 113(f)(1).  We do not, however, interpret § 113(f)(1)'s language as mandating a federal common law rule be fashioned to resolve the issue of a limited partner's liability under CERCLA for the partnership's debts.

The issue of the Hutton partners' liability under CERCLA, as was the issue in *Kimbell Foods,* is unquestionably "governed by federal law."  *Cf. Kimbell Foods,* 440 U.S. at 726, 99 S.Ct. at 1457.  Our task is to determine whether "federal law" should be a uniform common law rule or the applicable state law rule.  In *Kimbell Foods,* the Supreme Court held federal law should adopt "nondiscriminatory state laws" as the federal decision rule in resolving the priority of liens stemming from governmental lending programs.  *Id.* at 740, 99 S.Ct. at 1465.  Similarly, we conclude state partnership law should be adopted as the federal decision rule for evaluating a limited partner's liability under CERCLA.  Thus, in resolving Redwing's contribution claims under § 113(f), we are applying a federal law rule that is defined by the applicable state law.

1537, 1545 (11th Cir.1989).  As have other courts that have addressed similar issues of corporate liability under CERCLA, *see Anspec Co.,* 922 F.2d at 1248-51 (Kennedy, J., concurring); *Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261, 1279 (E.D.Pa.1994), we find it necessary to apply the *Kimbell Foods* test to the issue of whether federal common law or state law should govern when a limited partner can be held accountable for the CERCLA liability of the partnership.  After doing so, we conclude this question should be answered according to the applicable state law rule.

Initially, we are not convinced of the need for a uniform federal rule governing limited partner liability under CERCLA. [14]

---

[14] There is significant agreement among the 50 states and the District of Columbia on the broad outlines of a rule governing the liability of limited partners.  This is because nearly every jurisdiction in this country has adopted a version of the Revised Uniform Limited Partnership Act of 1976 (RULPA).

Section 303 of RULPA defines when a limited partner is liable to a third party.  *See* Revised Unif. Limited Partnership Act § 303, 6A U.L.A. 144-45 (1995).  As amended in 1985, § 303 of RULPA holds a limited partner who has "participate[d] in the control of the business" liable to:

> persons who transact business with the limited partnership reasonably believing, based upon the limited partner's conduct, that the limited partner is a general partner.

*Id.* at § 303(a), 6A U.L.A. 144.  In its "safe harbor" provisions, the model rule defines certain acts a limited partner can take without being deemed to "participate in the control of the business" thereby jeopardizing the partner's limited liability.  *See id.* at § 303(b), 6A U.L.A. 144-45. This rule, with some modifications among the jurisdictions, has been adopted by 39 states and the District of Columbia. *See id.* at 6A U.L.A. 1-2 (table) (listing statutory citations to state law adaptations of the model act).

Seven states—Alabama, Iowa, Michigan, Montana, New Jersey, North Carolina and South Carolina—have adopted the

Adopting a uniform rule would, perhaps, expedite enforcement of CERCLA by decreasing uncertainty in assessing liability under the statute. But this argument could be made for adopting a uniform rule in the context of just about any federal statute. If this interest was sufficient in every case, then the Supreme Court would not, as it did in *Kimbell Foods,* have sanctioned adopting state law as the federal rule of decision. Absent a showing that state partnership law is inadequate to achieve the goals of CERCLA, "we discern no imperative need to develop a general body of federal common law to decide cases such as this." *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 673, 99 S.Ct. 2529, 2541, 61 L.Ed.2d 153 (1979); *cf. Anspec Co.,* 922 F.2d at 1249 (Kennedy, J., concurring) (citing *Wilson* in support of adopting state corporate law on "successor" liability in a CERCLA action).

Nor do we view state rules governing the liability of limited partners as being in conflict with CERCLA's goals. "An essential purpose of CERCLA is to place the ultimate responsibility for the

---

test for limited partner liability set forth in § 303(a) of RULPA prior to the 1985 amendments. *See id.* Under this standard, a limited partner is liable if:

> in addition to the exercise of his [or her] rights and powers as a limited partner, he [or she] takes part in the control of the business. However, if the limited partner's participation in the control of the business is not substantially the same as the exercise of the powers of a general partner, he [or she] is liable only to persons who transact business with the limited partnership with actual knowledge of his participation in control.

Revised Unif. Limited Partnership Act § 303(a), 6A U.L.A. 144 (1995). With 47 jurisdictions having based their rule of limited partner liability on either the amended or unamended version of § 303 of RULPA, the need for a federal common law standard diminishes.

clean up of hazardous waste on "those responsible for problems caused by the disposal of chemical poison.' " *Florida Power & Light Co. v. Allis Chalmers Corp.,* 893 F.2d 1313, 1317 (11th Cir.1990) (quoting *United States v. Aceto Agric. Chems. Corp.,* 872 F.2d 1373, 1377 (8th Cir.1989)). CERCLA, however, does not purport to be a source of partnership law. Thus, CERCLA does not require federal law displace state laws governing the liability of limited partners unless these laws permit action prohibited by the Act, or unless "their application would be inconsistent with the federal policy underlying the cause of action." *Anspec Co.,* 922 F.2d at 1249-50 (Kennedy, J., concurring) (quoting *Johnson v. Railway Express Agency,* 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975)).

In *Anspec Co.,* Judge Kennedy of the Sixth Circuit made the following observation regarding the adoption of state law on corporate dissolution and merger as the federal decision rule under CERCLA:

> Any fears that states will engage in a "race to the bottom" in their effort to attract corporate business and enact laws that limit vicarious liability are in my opinion groundless. States have a substantial interest in protecting their citizens and state resources. Most states have their own counterparts to CERCLA and the EPA and they share a complementary interest with the United States in enforcement of laws like CERCLA that are used to remedy environmental contamination. I see no necessity to create federal common law in this area to guard against the risk that states will create safe havens for polluters.

*Id.* at 1250. This observation applies with equal force in the context of state partnership rules governing the liability of limited partners. At present, state rules permit plaintiffs to hold limited partners accountable for a partnership's CERCLA

liability under certain circumstances.  We do not foresee states enacting more protective statutes in an effort to defeat CERCLA's goal of having the polluter pay.

The third factor in the *Kimbell Foods* analysis, the potentially unsettling effect of a federal common law rule on relations grounded on state law, offers the strongest support for adopting state law on limited partner liability.  What makes partnerships such as Saraland Limited attractive to investors is the very concept of limited liability:  as limited partners, investors can participate in the partnership's profits without exposing themselves to liability for the partnership's debts.  When determining whether to enter a limited partnership, however, investors naturally evaluate their ability to control their risk by participating in the management of the partnership.  Existing state limited-partnership statutes define how far a limited partner can go in managing the partnership's business without losing its limited liability status.  Given the popularity of the limited-partnership structure as a means of organizing businesses and attracting investment in this country, we hesitate to upset the expectations investors have under current state law rules by adopting a federal common law rule.

The *Kimbell Foods* factors weigh against crafting a common law rule in this case.  Consequently federal law governing liability under CERCLA should incorporate the applicable state law rule for determining when a limited partner loses its limited liability status so as to become accountable for the CERCLA liability of the partnership.  Having reached this conclusion, we turn to Alabama

law and the evidence of the Hutton partners' participation in Saraland Limited.

Section 10-9A-42(a) of the Alabama Code provides:

A limited partner is not liable for the obligations of a limited partnership unless he is also a general partner or, in addition to the exercise of his rights and powers as a limited partner, he takes part in the control of the business. However, if the limited partner's participation in the control of the business is not substantially the same as the exercise of the powers of a general partner, he is liable only to persons who, with actual knowledge of his participation in control and in reasonable reliance thereon, transact business with the partnership.

Ala.Code § 10-9A-42(a) (1994). In subsection (b), the statute lists certain acts a limited partner can take without being deemed to have "participate[d] in the control of the [partnership's] business" thus subjecting the partner to liability for the partnership's obligations under subsection (a). *Id.* § 10-9A-42(b).[15] The statute further clarifies that the listing of certain

---

[15]Section 10-9A-42(b) of the Alabama Code states in full:

A limited partner does not participate in the control of the business within the meaning of subsection (a) solely by doing one or more of the following:

(1) Being a contractor for or an agent, attorney-at-law, or employee of the limited partnership or of a general partner, or an officer, director, or shareholder of a general partner;

(2) Consulting with and advising a general partner with respect to the business of the limited partnership or examining into the state and progress of the partnership business;

(3) Acting as surety or guarantor for any liabilities for the limited partnership;

(4) Approving or disapproving an amendment to the partnership agreement; or

(5) Voting on one or more of the following matters:

"safe harbor" provisions in subsection (b) "does not mean that the possession or exercise of any other powers by a limited partner constitutes participation by him in the business of the limited partnership." *Id.* § 10-9A-42(c).

Under this standard, any effort to hold the Hutton partners liable must fail. While the Hutton partners possess rights under the amended partnership agreement to control important decisions in the Partnership's business, nothing in the record indicates the Hutton partners have ever exercised any of these rights. At most, the record reveals the Hutton partners have monitored their investment and implemented certain bookkeeping practices for the Partnership. Merely having the authority to control certain aspects of a partnership's business without actually using that authority does not amount to "tak[ing] part in the control of the [partnership's] business."

Since the Hutton partners have not lost their limited liability status under § 10-9A-42 of the Alabama Code, they cannot be held accountable for Saraland Limited's CERCLA liability based

> (i) The dissolution and winding up of the limited partnership;
>
> (ii) The sale, exchange, lease, mortgage, pledge, or other transfer of all or substantially all of the assets of the limited partnership other than in the ordinary course of its business;
>
> (iii) The incurrence of indebtedness by the limited partnership other than in the ordinary course of its business;
>
> (iv) A change in the nature of the business; or
>
> (v) The removal of a general partner.

Ala.Code § 10-9A-42(b).

on the Partnership's ownership of the Site.[16]

2. *"Operator" Liability.*

Whereas the Hutton partners can only be held *indirectly* liable under CERCLA and Alabama law based on the Partnership's *ownership* of Saraland Apartments, they can be held *directly* liable as *operators* of the Site. In the corporate context, courts have reasoned that an officer or a shareholder in a corporation may be directly liable under CERCLA if the officer or shareholder in fact operated the facility at issue. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420-21 (7th Cir.1994); *United States v. Kayser-Roth Corp.,* 910 F.2d 24, 26-27 (1st Cir.1990), *cert. denied,* 498 U.S. 1084, 111 S.Ct. 957, 112 L.Ed.2d 1045 (1991). This is so despite the traditional corporate law principle that officers, shareholders, and employees are not liable for the acts of a corporation. *Schiavone v. Pearce,* 79 F.3d 248, 253-54 (2d Cir.1996); *Riverside Mkt. Dev. Corp. v. International Building*

---

[16]Redwing argues the Hutton partners, as well as Coit and Roar, are liable as "successors" to Saraland Limited's CERCLA liability because the partners purchased interests in the partnership. Redwing relies on cases applying the corporate law doctrine of successor liability to hold a succeeding corporation liable under CERCLA for the acts of a predecessor corporation. *See e.g., United States v. Carolina Transformer Co.,* 978 F.2d 832, 837-38 (4th Cir.1992) (applying doctrine in CERCLA action).

Redwing misconstrues the nature of successor liability. In 1984, the Hutton partners, Coit, and Roar bought interests in an on-going partnership. Although the current Saraland Limited partnership could perhaps be considered a "successor" to the partnership formed in 1973 given an amended partnership agreement was executed in 1984, the current partners themselves are not "successors" to any partnership. Rather, they own an interest in the potential "successor" partnership. Holding an interest in a partnership, even a 99% interest, does not make a partner a "successor" to any partnership debts.

*Prods.,* 931 F.2d 327, 330 (5th Cir.), *cert. denied,* 502 U.S. 1004, 112 S.Ct. 636, 116 L.Ed.2d 654 (1991).  We implicitly recognized the direct nature of operator liability in *Jacksonville Elec. Auth. v. Bernuth Corp.,* 996 F.2d 1107, 1109-11 (11th Cir.1993) [hereinafter *"Jacksonville Elec."*].[17]  The Hutton partners may therefore be held accountable for cleaning up the Saraland Site, despite the fact the Partnership owns the property, if the limited partners themselves were operators of the Site.

In *Jacksonville Elec.,* we reviewed the standard for assessing operator liability under CERCLA.  In that case, the owner of property that was formerly the site of a wood treatment facility sued Tufts University to recover costs the property owner had

---

[17]Panels from two circuits have suggested that operator liability under § 107(a) may only be imposed derivatively against officers and shareholders in a corporation through "piercing the corporate veil."  In *Joslyn Mfg. Co. v. T.L. James & Co.,* 893 F.2d 80, 82-83 (5th Cir.1990), *cert. denied,* 498 U.S. 1108, 111 S.Ct. 1017, 112 L.Ed.2d 1098 (1991), a Fifth Circuit panel rejected any "control test" in assessing "owner or operator" liability under § 107(a)(2).  Without distinguishing between "owner" and "operator" liability, the *Joslyn Mfg.* panel concluded a shareholder could only be held liable under this provision in circumstances justifying the piercing of the corporation's veil. *Joslyn Mfg.,* 893 F.2d at 83.  A subsequent panel from the same circuit, however, has reasoned "CERCLA prevents individuals from hiding behind the corporate shield when, as "operators,' they themselves actually participate in the wrongful conduct prohibited by the Act."  *Riverside Mkt. Dev. Corp.,* 931 F.2d at 330.  *Riverside Mkt.* suggests *Joslyn Mfg.*'s reasoning has been limited to "owner" liability.

A panel of the Sixth Circuit likewise concluded in a case involving a parent corporation being sued for the conduct of its subsidiary that "a parent corporation incurs operator liability pursuant to section 107(a)(2) of CERCLA ... only when the requirements necessary to pierce the corporate veil are met."  *United States v. Cordova Chem. Co.,* 59 F.3d 584, 590 (6th Cir.1995).  This decision was subsequently vacated for en banc rehearing by the Sixth Circuit.  *See United States v. Cordova Chem. Co.,* 67 F.3d 586 (6th Cir.1995).

incurred in cleaning up creosote and arsenic contamination. *Jacksonville Elec.,* 996 F.2d at 1108. From 1926 to 1942, Tufts University held most and eventually all of the stock of Eppinger & Russell, the company that owned the wood treatment facility. *Id.* The property owner alleged the University was liable under subsection 107(a)(2) of CERCLA as a party who operated the wood treatment plant at the time creosote and arsenic were disposed of on the property. *Id.* at 1109-11.

In upholding summary judgment for the University, we reasoned that because "CERCLA contemplates "operator' liability based only on a person's actions," mere ownership of stock in a corporation that disposed of hazardous waste was not sufficient to hold a shareholder liable. *Id.* at 1110. (citing *Kayser-Roth,* 910 F.2d at 27). Instead, shareholders are "operators" under the statute only when "they themselves actually participate in the wrongful conduct prohibited by the Act." *Id.* (quoting *Riverside Mkt. Dev. Corp.,* 931 F.2d at 330). We concluded:

> [A] person is liable as an "operator" when that person actually supervises the activities of the facility. That is, the person must play an active role in the actual management of the enterprise.

*Id.*

Citing *Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837 (4th Cir.), *cert. denied,* 506 U.S. 940, 113 S.Ct. 377, 121 L.Ed.2d 288 (1992), Redwing argues the Hutton partners are operators of the Saraland Site because they have the authority to control the property. In *Nurad,* the Fourth Circuit reasoned subsection 107(a)(2) imposes operator liability on a party who had the "authority to control" a hazardous waste site regardless of

whether they exercised "actual control" of the site. *Nurad,* 966 F.2d at 842; *see also United States v. Carolina Transformer Co.,* 978 F.2d 832, 836-37 (4th Cir.1992) (interpreting *Nurad* as requiring only "authority to control" site).[18] Redwing contends the Hutton partners have the authority to control the Saraland Site because they own a 99% interest in the Partnership, retained significant control over the Partnership's business through rights secured in the amended partnership agreement, and agreed to remove the tar seeps on the property.

Redwing's argument fails on both the law and the evidence. The Fourth Circuit's "authority to control" test is simply incompatible with our reasoning in *Jacksonville Elec.* In *Jacksonville Elec.,* we adopted the "actual control" standard for operator liability. *See Jacksonville Elec.,* 996 F.2d at 1110; *accord Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.,* 4 F.3d 1209, 1222 (3d Cir.1993); *Kayser-Roth,* 910 F.2d at 27 (1st Cir.).[19]

---

[18]The Ninth Circuit has suggested the "authority to control" standard applies in that circuit as well. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1341-42 (9th Cir.1992) (citing *Nurad* ).

[19]The Eighth Circuit has rejected the "authority to control" test articulated by the Fourth Circuit in *Nurad* in favor of the following standard:

> [A]n individual may not be held liable as an "operator" under § 9607(a)(2) unless he or she (1) had authority to determine whether hazardous wastes would be disposed of and to determine the method of disposal and (2) actually exercised that authority, either by personally performing the tasks necessary to dispose of the hazardous wastes or by directing others to perform those tasks.

*United States v. Gurley,* 43 F.3d 1188, 1193 (8th Cir.1994), *cert. denied,* --- U.S. ----, 116 S.Ct. 73, 133 L.Ed.2d 33 (1995).

Under this standard, it is not enough that the Hutton partners hold a 99% interest in Saraland Limited. Nor is it sufficient that the limited partners have the authority under the partnership agreement to control important decisions for the Partnership. Rather, Redwing must demonstrate the Hutton partners either (1) actually participated in operating the Site or in the activities resulting in the disposal of hazardous substances, or (2) "actually exercised control over, or [were] otherwise intimately involved in the operations of" the Partnership. *See Jacksonville Elec.*, 996 F.2d at 1110 (quoting *Levin Metals Corp. v. Parr-Richmond Terminal Co.*, 781 F.Supp. 1454, 1456-57 & n. 9 (N.D.Cal.1991)).

Redwing has failed to show the Hutton partners actually controlled the Partnership or the Site itself. As noted earlier, there is no evidence the limited partners have invoked their rights under the partnership agreement to control the Partnership's affairs. Moreover, the record lacks any significantly probative

---

The Eighth Circuit's rule in *Gurley* goes beyond our reasoning in *Jacksonville Elec.* in protecting officers, shareholders and employees from operator liability. Under *Gurley,* an officer or shareholder of a corporation can only be found liable as an operator when they actually controlled the disposal of hazardous substances at a facility. *See id.* In contrast, we stated in *Jacksonville Elec.* that "[a]ctual involvement in decisions regarding the disposal of hazardous substances is a sufficient, *but not a necessary,* condition to the imposition of operator liability." *Jacksonville Elec.,* 996 F.2d at 1110 (quoting *Jacksonville Elec. Auth. v. Eppinger & Russell Co.,* 776 F.Supp. 1542, 1547-48 (M.D.Fla.1991)) (emphasis added). Under this Circuit's standard, an individual need not have actually controlled the specific decision to dispose of hazardous substances. Rather, it is enough if the individual "actually participated in the operations of the facility ... [or] actually exercised control over, or was otherwise intimately involved in the operations of, the corporation immediately responsible for the operation of the facility." *Id.* (citation and quotation marks omitted).

evidence that the Hutton partners controlled the Saraland Site itself or had any connection with the alleged disposals occurring after they bought their interest in 1984.[20] Redwing has therefore failed to carry its burden on summary judgment of showing the Hutton partners are operators of the Site.[21]

3. *"Arranger" Liability.*

Subsection 107(a)(3) imposes liability on "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances ... at any facility." 42 U.S.C. § 9607(a)(3).[22] Redwing contends the Hutton partners have "arranged for" the disposal of hazardous substances at the Saraland

---

[20]Redwing claims the repaving of the apartment complex's parking lot in 1986 and repair work on the gas line in 1991 resulted in "disposals" of contaminated dirt at the Site.

[21]Redwing contends the Hutton partners agreed in 1984 to remedy the tar seep problem at Saraland Apartments in exchange for a $15,000 reduction in the purchase price of their partnership interest. Redwing further claims HUD conditioned the transfer of interests in Saraland Limited on the Hutton partners assuming responsibility for the tar seep problem.

Even viewed in a light most favorable to Redwing, the record does not reveal the Hutton partners received a reduced price for assuming the duty of repairing the tar seep problem or that HUD conditioned the 1984 deal on the partners taking on this task. Assuming the record did support Redwing's factual claims, we fail to appreciate how this evidence supports finding the Hutton partners operated the Site within the meaning of CERCLA. At best, this evidence shows the Hutton partners agreed to rectify the tar seeps noted in the 1984 HUD report. It does not suggest the limited partners have assumed control over the Partnership or the Site itself. And it does not link the partners to the alleged disposals resulting from the parking lot repaving in 1986 and the gas line work in 1991.

[22]This liability, like that of an "operator" under subsection 107(a)(1) and (a)(2), is direct. *See United States v. TIC Inv. Corp.,* 68 F.3d 1082, 1092 (8th Cir.1995), *pet. for cert. filed,* 64 U.S.L.W. 3727 (U.S. Apr. 2, 1996) (No. 95-1698).

Site since they purchased their interests in the Partnership. In particular, Redwing points to two events occurring after October 1984 that allegedly resulted in "disposals" on the property: the repaving of the apartment complex's parking lot in 1986 and the gas line repairs in 1991. Redwing also argues the Hutton partners "arranged for" a disposal when they agreed to remove the tar seeps as part of the 1984 deal, yet failed to do so.

The district court rejected Redwing's subsection 107(a)(3) claim against the Hutton partners based on its finding the parking lot and gas line repairs did not result in "disposals" of hazardous substances as that term is used in CERCLA. *See Redwing Carriers,* 875 F.Supp. at 1559. In the alternative, the district court reasoned the Hutton partners could not have "arranged for" a disposal because the partners lacked the intent to dispose in connection with the repairs in 1986 and 1991, and did not make any of the "crucial decisions" regarding how, when, and where the alleged disposals were to occur. *See id.* We agree with the district court's disposition of this arranger claim, but for different reasons.

Initially, Redwing fails to explain how the Hutton partners' alleged inaction in cleaning up the tar seeps amounts to an "arrangement" for disposal. Even assuming the record supported Redwing's position that the partners agreed to clean up the tar seeps, this demonstrates only that the partners agreed to remove the tar-like substance from the Site and dispose of it elsewhere. Redwing's proof fails to show the 1984 deal involved any arrangement for the disposal of hazardous substances at the

Saraland Site. And this is the only facility at issue here.

Furthermore, we do not accept Redwing's premise that under the circumstances of this case, the Hutton partners' alleged failure to remove the tar seeps qualifies as an arrangement to dispose of a hazardous substance. By failing to excavate the tar seeps, the Hutton partners merely left the hazardous substances in the ground. They took no "affirmative act" to dispose of the tar-like substances. *See South Fla. Water Management Dist. v. Montalvo,* 84 F.3d 402, 407 (11th Cir.1996). While this inaction on the partners' part may amount to a breach of an alleged contractual duty, it does not amount to an "arrangement" for disposal within the meaning of CERCLA.[23]

The record also fails to support an arranger claim based on the parking lot repaving and gas line work. Simply put, Redwing has failed to establish any link between the Hutton partners and these events. Again, there is no proof the Hutton partners participated in the management of the apartment complex, or otherwise approved of the repairs. Indeed, there is no evidence the partners even knew about these events at the time they were occurring. Absent some evidence linking the Hutton partners to the

---

[23]In holding Redwing has failed to demonstrate a subsection 107(a)(3) claim against the Hutton partners in this case, we are not stating it is impossible for an arranger claim to be based on a defendant's failure to take action. Whether a party has "arranged for" the disposal of a hazardous substance within the meaning of subsection 107(a)(3) depends on the particular facts of the case. *South Fla. Water Management Dist.,* 84 F.3d at 407. Here, the record fails to demonstrate the Hutton partners made any "arrangement to dispose" by simply failing to rectify the tar problems at the Saraland Apartments complex. It is possible that under different factual circumstances, a plaintiff could predicate a claim under subsection 107(a)(3) on a defendant's failure to act.

decisions to make these repairs, Redwing's arranger claims must fail.

Under the circumstances, we conclude the district court properly granted summary judgment to the Hutton partners on Redwing's claims under subsection 107(a)(3). Since we also find the district court did not err in granting judgment for the limited partners on Redwing's owner and operator claims under subsections 107(a)(1) and (a)(2), we affirm the court's grant of summary judgment in favor of the Hutton partners in all respects.[24]

---

[24]In its 1993 unilateral administrative order (UAO), the EPA concluded the Hutton partners, as well as the other Appellees, were responsible parties under § 107(a) of CERCLA. Redwing repeatedly refers to the EPA's UAO as proof the Appellees are liable under the Act and should be forced to bear part or all of the clean up costs at the Site. Redwing suggests this Court must defer to the EPA's findings in its UAO because Congress has entrusted the agency to interpret and administer CERCLA.

Redwing mischaracterizes the nature of the EPA's findings in its UAO. The EPA issued this order pursuant to its authority under § 106(a) of CERCLA to issue "such orders as may be necessary to protect public health and welfare and the environment." *See* 42 U.S.C. § 9606(a). When the EPA issues a § 106 order to a party, the agency is not interpreting the statute or otherwise engaging in rulemaking authorized by Congress. Instead, the EPA is acting in its role as prosecutor in enforcing a federal environmental statute. Any findings made in such orders are therefore not entitled to deference under the reasoning of *Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) or our decision in *Borden v. Meese,* 803 F.2d 1530, 1535 (11th Cir.1986). Rather than being authoritative interpretations of a statute, these findings are merely the agency's conclusions regarding who is liable under CERCLA given the facts of a particular case. Although the EPA's view of who is liable for cleaning up the Saraland Site may support Redwing's case, neither the district court nor this Court are obliged to defer to the agency's conclusions on this issue. Courts, not the EPA, are the adjudicators of the scope of CERCLA liability. *See Kelley v. Environmental Protection Agency,* 15 F.3d 1100, 1107-08 (D.C.Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995).

B. *Robert Coit and Roar Company*

At the same time the Hutton partners invested in Saraland Limited, Robert Coit and Roar Company became general partners in the Partnership. Redwing alleges the general partners, like the limited partners, are liable as owners and operators of the Saraland Site. Redwing further asserts Coit and Roar have on several occasions "arranged for" the disposal of hazardous substances on the property. Coit and Roar initially deny being responsible parties as defined in § 107(a). Assuming they are responsible under § 107(a), Coit and Roar contend the "third-party" defense of subsection 107(b)(3) shields them from liability.

The district court concluded Coit and Roar were entitled to summary judgment on both grounds. *See Redwing Carriers,* 875 F.Supp. at 1566-67. Since we agree with the district court's finding that Coit and Roar have carried their burden of proving their affirmative defense, we affirm summary judgment in their favor on Redwing's CERCLA claims brought directly against these partners. For the purposes of this appeal, we assume Coit and Roar are responsible parties under § 107(a) of CERCLA.[25]

Persons who are responsible under § 107(a) may escape CERCLA liability if they can prove one of the three affirmative defenses set forth in § 107(b). *See* 42 U.S.C. § 9607(a). The first two defenses, barring liability if a release or threat of release resulted solely from an "act of God" or an "act of war," are rarely invoked and not applicable here. *See id.* § 9607(b)(1), (2). The

---

[25]We express no opinion regarding the district court's finding that Coit and Roar are not responsible parties within the meaning of § 107(a).

final defense, referred to as the "third-party" defense, is cited most often by litigants. *See id.* § 9607(b)(3). Subsection 107(b)(3) provides in relevant part:

> "There shall be no liability under subsection (a) of this section for a person otherwise liable who can establish by a preponderance of the evidence that the release or threat of release of a hazardous substance and the damages resulting therefrom were caused solely by—
>
> ....
>
> (3) an act or omission of a third party other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant ... if the defendant establishes by a preponderance of the evidence that (a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any such third party and the consequences that could foreseeably result from such acts or omissions ..."

*Id.* § 107(b)(3).

Coit and Roar have satisfied all the elements of this defense. The general partners have never had a direct or indirect contractual relationship with either Redwing or Meador Contracting Company—the only two parties whose conduct potentially caused the release or threat of release of hazardous substances at the Saraland Site.[26] Redwing closed its trucking terminal on the

---

[26]The general partners and the district court point to Redwing as being the only "third party" at issue here. *See Redwing Carriers,* 875 F.Supp. at 1567. Although it was Redwing who originally disposed of the toxic substances now seeping to the surface of the Site, Meador is another party who may be guilty of causing a release or threat of release on the property. As explained in section III(D), *infra,* we reverse the district court's summary judgment in favor of Meador after concluding that in grading and filling the land while constructing the apartment complex, Meador's subcontractor may have dispersed contaminated soil throughout the Site. Meador therefore must be considered a "third party" potentially responsible for the release or threat

property in 1972. Approximately two years later, Meador graded and filled the property while building the apartment complex. Coit and Roar had no contact with these parties when they purchased their partnership interest in Saraland Limited in 1984—12 years after Redwing last buried toxic substances on the Site. It is plain that the environmental damage to this property was done long before Coit and Roar ever became partners in Saraland Limited.

The record indicates that since 1984, the general partners have exercised due care towards the hazardous substances contaminating the property. A HUD report identified tar seeps on the property in August 1984, and three months later Coit approved a maintenance plan to remove the seeps. In April and May of 1985, the EPA conducted its preliminary investigation of the Site. Two months later, the EPA entered into its first consent order with Redwing requiring Redwing to, among other things, periodically remove tar-like material from the surface of the property. Thus, less than a year after Coit and Roar became general partners, a program was in place to remedy the tar seeps on the property.

Meanwhile, Coit and Roar have demonstrated they did nothing to exacerbate conditions at the Site. Redwing has identified only two events after 1984—the repaving of the parking lot and the maintenance work on the gas line—that allegedly increased the amount of contaminated soil on the property. As general partners, Coit and Roar approved these projects. Nothing suggests, however, that in repaving the parking lot and repairing the gas line, workers disturbed contaminated soil or otherwise disposed of

of release of hazardous substances at the Site.

hazardous substances on the Site.  The record supports the general partners' position that they have taken all necessary precautions in addressing a toxic waste problem created almost entirely by Redwing.

Regardless of their liability under § 107(a), Coit and Roar have carried their burden of demonstrating they are entitled to summary judgment on their third-party defense under § 107(b).  This defense relieves the general partners of any direct liability under CERCLA.

We note, however, that whether Coit and Roar are accountable for the Partnership's CERCLA liability remains an open issue.[27] Although the parties debated this question on summary judgment, the district court did not grant or deny judgment on this claim. Instead, the court dismissed all "partnership law" claims as being moot.  *Redwing Carriers,* 875 F.Supp. at 1571.  This holding is

---

[27]It is widely accepted that general partners are liable for a partnership's debts.  Every state except Louisiana has adopted a version of either the Uniform Partnership Act of 1914 (1914 Act) or Uniform Partnership Act of 1994 ("Revised Act").  *See* Unif. Partnership Act (1994), 6 U.L.A. 1 (1995) (table) and Unif. Partnership Act (1914), 6 U.L.A. 125-26 (1995) (table).  Section 15 of the 1914 Act makes general partners jointly liable for the obligations of the partnership.  Unif. Partnership Act (1914) § 15, 6 U.L.A. 456.  Among the states that have adopted the 1914 Act, there is a split between those who have retained the joint liability standard proposed by the drafters and those who modified the uniform rule to impose joint and several liability. *See id.* (comment).  The Revised Act, which has been adopted in seven states, modifies the 1914 Act to impose joint and several liability.  *See* Unif. Partnership Act (1994) § 306, 6 U.L.A. 45. Both the 1914 Act and the Revised Act limit the liability of incoming partners for pre-existing partnership obligations.  *See id.;* Unif. Partnership Act (1914) § 17, 6 U.L.A. 519.  Although the nature of liability varies, the 49 jurisdictions that have patterned their partnership law on one of the uniform acts all impose liability on general partners for the obligations of the partnership.

apparently premised on the court's absolving the Partnership of any liability by allocating the entire cost of cleaning up the Site to Redwing. As explained below, we must reverse and remand the district court's equitable allocation of costs in light of our conclusion the court erred in granting summary judgment in favor of Marcrum and Meador. Should the district court on remand find Saraland Limited must bear some of the response costs, the question of Coit and Roar's liability for these costs would again be before the court. Since the record in regard to Redwing's partnership law claims against Coit and Roar is poorly developed, we leave it to the district court to address the legal and factual issues raised by Redwing's derivative claims against the general partners.

C. *Marcrum Management Co.*

The 1984 partnership agreement between Coit, Roar, and the Hutton partners calls for a "management agent" to carry out the general partners' duty of managing Saraland Apartments. Since 1980, Marcrum Management Co. has served as the Partnership's management agent. An agreement between Marcrum and the Partnership details the company's duties.[28] Marcrum characterizes its role as providing "administrative" assistance and "consulting" with the Partnership on how the complex should be managed.

Redwing asserts Marcrum is not a mere consultant, but is

---

[28]Marcrum must perform the following services, among others, at the complex: (1) show the premises to prospective tenants, as well as process rental applications, screen applicants, and lease apartments; (2) collect rents; (3) enforce leases; and (4) maintain and repair the complex. Although the management agreement designates the residential manager an employee of the Partnership, the agreement holds Marcrum responsible for hiring, supervising, and firing the resident manager.

instead responsible for the daily management of the complex. Consequently, Redwing alleges Marcrum is liable as the current and past operator of the Site under subsections 107(a)(1) and (a)(2). The district court granted Marcrum's motion for summary judgment on these claims after finding Marcrum was not an "operator" of the Site based on the reasoning of *Jacksonville Elec. Redwing Carriers,* 875 F.Supp. at 1559-60. The court further reasoned Marcrum could not be liable under subsection 107(a)(2) because there were no "disposals" on the property after Marcrum became involved with the Site in 1980. *Id.* at 1560-63.[29]

Contrary to Marcrum's claim, there is evidence the management company has done more than "consult" or give "administrative" assistance in managing the complex. The record indicates Marcrum has done the following in its role as managing agent for the complex:

1. prepared annual budgets for the complex and required the resident manager to regularly report expenses to Marcrum and seek approval from Marcrum of any expenses exceeding the budget;

2. regularly inspected the complex, and required the resident manager to perform quarterly inspections and report on these inspections to Marcrum;

3. ordered the resident manager to implement major improvement and repair programs for the complex as a whole;

4. ordered the resident manager to make specific repairs to particular units by certain deadlines;

5. received complaints from tenants, and forwarded these complaints

---

[29]In its amended complaint, Redwing also charged Marcrum with having "arranged for" the disposal of hazardous substances at the Site according to subsection 107(a)(3). The district court granted summary judgment in favor of Marcrum on this arranger claim, *see Redwing Carriers,* 875 F.Supp. at 1563, but Redwing has not appealed this holding.

to the resident manager with instructions as to how and by when to respond to the complaints; and

6. prepared proposed rent increases for approval by the Partnership and HUD.

In addition to having a hand in these routine operations of the complex, the record also suggests Marcrum has, in the past, been partly responsible for remedying tar seeps as they appeared on the property.

Taken as a whole, this evidence could support a claim that Marcrum is an operator of the Saraland Site. Unlike the case against Tufts University in *Jacksonville Elec.,* it is evident Marcrum is "actively involved in ... [the] occupational business affairs" of Saraland Apartments. This supports finding Marcrum has "actually participated in the operations of the facility" so as to be an "operator" within the meaning of § 107(a). *Jacksonville Elec.,* 996 F.2d at 1110. We therefore reverse the district court's grant of summary judgment on Redwing's claim under subsection 107(a)(1) based on Marcrum being a current operator of the Site.

While demonstrating Marcrum is currently an operator of the Site may establish a claim under subsection (a)(1), this does not support an operator claim under subsection (a)(2). Subsection (a)(2) covers only persons who were operators of a facility "at the time of disposal of any hazardous substance." 42 U.S.C. § 9607(a)(2). Under this provision, Marcrum is only accountable if a "disposal" occurred during the time it has operated the facility, *i.e.,* since 1980. Again, the only two events occurring after 1980 that could possibly be deemed "disposals" are the gas line repair work and the repaving of the complex's parking lot. Redwing's

subsection 107(a)(2) claim against Marcrum is based on the belief that during these activities, workers disturbed and disbursed contaminated soil at the Site.

The district court did not dispute Redwing's premise that the dispersal of hazardous substances already deposited at a facility could amount to a "disposal" under CERCLA. *See Redwing Carriers,* 875 F.Supp. at 1561. Instead, the court crafted a test for when such a dispersal results in a "second-hand disposal." *Id.* at 1561-63. Applying this test, the district court concluded neither the gas line repair work nor the parking lot repaving qualified as a "disposal" within the meaning of CERCLA. *Id.* at 1563.

While we arrive at the same conclusion, we must reject the district court's "second-hand disposal" standard and its analysis. According to CERCLA, a "disposal" occurs whenever a party "deposit[s] ... or plac[es] ... any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. §§ 9601(29), 6903(3). Instead of parsing the language of this definition to arrive at a rigid rule for when conduct results in a "disposal," courts should look at the definition of "disposal" in its entirety in ascertaining whether a particular event qualifies as such.

Viewed in this fashion, we do not read CERCLA's definition of "disposal" as being limited to instances where a hazardous substance is initially introduced into the environment at a facility. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev.*

*Corp.,* 976 F.2d 1338, 1342 (9th Cir.1992). Rather, CERCLA's definition of "disposal" should be read broadly to include the subsequent movement and dispersal of hazardous substances within a facility. *Id.* (citing *Tanglewood E. Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988)).

As noted earlier, however, the record lacks any evidence that either the repaving of the parking lot in 1986 or the gas line work in 1991 resulted in a movement of contaminated soil. As to the repaving of the parking lot, the record reveals only that this task was performed. Nothing suggests that during the course of the repaving any contaminated soil was moved or dispersed on the Site. Likewise, the record does not indicate soil was "disposed of" while servicing the gas line in 1991. While this maintenance necessitated digging through soil to reach the gas line, there is no indication the soil was contaminated. Furthermore, the only reasonable inference is that any soil dug up during the process was returned from whence it came. No matter how broadly the term is defined, this conduct did not amount to a "disposal."

Redwing has therefore failed to carry its burden of demonstrating there is a genuine issue of fact as to whether either the gas line work or the parking lot repaving resulted in a "disposal" as defined in CERCLA. The district court thus properly granted summary judgment against Redwing on its operator claim against Marcrum based on subsection 107(a)(2).

D. *Meador Contracting Company*

Meador's only connection with the Site was back in 1973 and 1974 when, as the Partnership's contractor, Meador constructed the

Saraland Apartments complex. In preparing to build the complex, Meador had to excavate, grade, and fill the land over much of the five-acre site. Meador apparently subcontracted part or all of this excavation work to another party. Meador hired another subcontractor to apply the pesticides chlordane and dieldrin to the ground and foundations of the buildings as termite treatment. Tests reveal these two hazardous substances are present in the soil at the Site.

Based on the excavation and pesticide treatment, Redwing alleges Meador "arranged for" the disposal of hazardous substances on the property.[30] Redwing contends that in grading and filling the land, Meador and its subcontractor dug up and dispersed throughout the property the tar-like substances Redwing had earlier buried on the Site. According to Redwing, this dispersal amounted to a "disposal" under CERCLA. Redwing further argues the application of chlordane and dieldrin was a separate disposal of hazardous substances for which Meador can be held accountable under subsection 107(a)(3).

The district court rejected Redwing's arguments and granted summary judgment to Meador. *Redwing Carriers,* 875 F.Supp. at 1564-

---

[30]Redwing also asserts Meador was an "operator" of the Site under subsection 107(a)(2). Redwing neither pled this claim in its amended complaint nor argued it before the district court in summary judgment proceedings. As a general rule, we will not address claims or arguments not fairly presented to the district court. *RTC v. Dunmar Corp.,* 43 F.3d 587, 598 (11th Cir.) (en banc), *cert. denied,* --- U.S. ----, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995). We therefore refuse to review Redwing's claim that Meador is an "operator" under CERCLA. For the same reason, we decline to address Meador's defense that holding it liable under CERCLA would amount to an unconstitutional extension of Congress' Commerce Clause powers according to *United States v. Lopez,* --- U.S. ----, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

65. Relying on its "second-hand disposal" analysis, the court concluded the grading and filling of the Site in 1973 and 1974 did not result in a "disposal." *Id.* at 1564. The court further reasoned Meador was insulated from liability for the termite treatment by subsection 107(i) of the Act.[31] *Id.* at 1564-65.

Two other circuits have interpreted CERCLA's definition of "disposal" to include the dispersal of contaminated soil during the excavation and grading of a construction site. *See Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp.,* 976 F.2d 1338, 1342 (9th Cir.1992); *Tanglewood E. Homeowners v. Charles-Thomas, Inc.,* 849 F.2d 1568, 1573 (5th Cir.1988). In *Kaiser,* it was alleged a contractor had excavated tainted soil during the construction of a housing development at the former site of a shipbuilding plant. 976 F.2d at 1339-40. The contractor allegedly spread this soil over uncontaminated portions of the property. *Id.* at 1342.

---

[31]This provision states in relevant part:

> No person (including the United States or any State or Indian tribe) may recover under the authority of this section for any response costs or damages resulting from the application of a pesticide product registered under the Federal Insecticide, Fungicide, and Rodenticide Act [FIFRA].

42 U.S.C. § 9607(i).

We affirm the district court's finding that Meador cannot be held liable for the alleged disposal of chlordane and dieldrin. Redwing has not produced any evidence refuting Meador's proof that these pesticides were properly applied to treat the property for termites. Although chlordane and dieldrin have since lost their registration under FIFRA, the record indicates these pesticides were registered under FIFRA at the time they were applied at the Site. Subsection 107(I) thus protects Meador from liability under CERCLA for this application. *See* 42 U.S.C. § 9607(i).

Likewise, developers in *Tanglewood* allegedly filled and graded creosote pools on the grounds of a former wood treatment facility. 849 F.2d at 1573. The courts in *Kaiser* and *Tanglewood* held these allegations stated the developers had disposed of hazardous substances for CERCLA purposes even though they had not introduced the substances to the sites. *See Kaiser,* 976 F.2d at 1342; *Tanglewood,* 849 F.2d at 1573. We agree with the Fifth and Ninth circuits, and hold that a "disposal" may occur when a party disperses contaminated soil during the course of grading and filling a construction site.

In the district court, Redwing supported its motion for summary judgment with evidence showing contaminated soil was dispersed during the construction of Saraland Apartments. Redwing's expert testified that soil borings revealing seams of the tar-like substance are located in fill material placed on the Site during construction. Moreover, contaminated soil has been found in an area of the Site that was inaccessible during Redwing's occupation of the property. This evidence contradicts Meador's position that any contaminated soil encountered during the preparation of the Site was dug up and disposed of off the property.

Unable to prevail on its disposal argument, Meador contends it still cannot be held liable under subsection 107(a)(3) because it never intended to dispose of hazardous substances when it built the complex and did not make the "crucial decisions" regarding how, where, and when to dispose of contaminated soil at the Site. A CERCLA plaintiff, however, need not demonstrate a party acted with

the specific intent to dispose of hazardous substances or made certain "crucial decisions" regarding the disposal of those substances in order to establish a defendant has "arranged for" a disposal. *South Fla. Water Management Dist. v. Montalvo,* 84 F.3d 402, 407 (11th Cir.1996); *United States v. TIC Inv. Corp.,* 68 F.3d 1082, 1088-89 (8th Cir.1995) (rejecting argument that subsection 107(a)(3) incorporates a specific intent requirement). While these factors are certainly relevant in assessing arranger liability, they are not required to establish liability under subsection 107(a)(3) in every case. *See South Fla. Water Management Dist.,* 84 F.3d at 407.

Since the district court erred in finding as a matter of law that the grading and filling of the Site could not have resulted in a disposal of hazardous substances, we reverse on this claim.

E. *Equitable Allocation of Costs under § 113(f)*

Of the Appellees, the district court found only Saraland Limited was a responsible party under § 107(a). The court, however, granted summary judgment to the Partnership and the partners on their counterclaims against Redwing for contribution under § 113(f). This section provides that a court "may allocate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9613(f). The court concluded that between Redwing and Saraland Limited, Redwing should bear all of the costs of cleaning up the Saraland Site. *Redwing Carriers,* 875 F.Supp. at 1569.

Having determined the district court erred in granting summary judgment in favor of Marcrum and Meador, we must reverse the

district court's allocation of costs under § 113(f). On remand, Marcrum and Meador could be found responsible parties under § 107(a) thus requiring the court to evaluate whether they should share liability with Redwing and Saraland Limited. In reversing the district court's allocation under § 113(f), we express no opinion on the court's decision to hold Redwing entirely responsible for cleaning up the property. Although the parties debate the equity of this holding, we need not review it at this time.

Our attention is instead drawn to the district court's underlying legal analysis which illustrates how courts and practitioners often misinterpret the nature of liability under § 113(f). The court reasoned that prior to allocating costs based on "such equitable factors as the court determines are appropriate," it first had to find the harm at the Saraland Site was "divisible." In finding the harm at the Site was divisible, the court relied on *United States v. Monsanto Co.,* 858 F.2d 160, 171-72 (4th Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), where the Fourth Circuit adopted the rule of § 433A of the Restatement (Second) of Torts for determining when to impose joint and several liability on parties found liable to federal and state governments under § 107(a) of CERCLA. *Redwing Carriers,* 875 F.Supp. at 1568. Through its reliance on *Monsanto* and other cases involving governmental plaintiffs, the district court improperly imported the "divisibility" defense to joint and several liability under § 107(a) into the analysis for equitable allocation under § 113(f).

CERCLA creates two avenues of recovery for two types of plaintiffs. Parties who are not themselves liable or potentially liable for response costs under § 107(a) of CERCLA can bring a cost recovery action directly under § 107(a) against potentially responsible parties. *See United Technologies Corp. v. Browning-Ferris Indus.,* 33 F.3d 96, 99-100 (1st Cir.1994), *cert. denied,* --- U.S. ----, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 764 (7th Cir.1994). Although it possible that a private party may qualify as an "innocent" plaintiff enabling it to bring a cost recovery action based on § 107(a) alone, the typical § 107(a) action is brought by a governmental plaintiff that has expended taxpayer dollars in cleaning up a facility. In most of these cases, where the focus is on allowing state and federal governments to recoup their expenses, defendants are held jointly and severally liable. *See, e.g., O'Neil v. Picillo,* 883 F.2d 176, 183 (1st Cir.1989), *cert. denied,* 493 U.S. 1071, 110 S.Ct. 1115, 107 L.Ed.2d 1022 (1990); *Monsanto,* 858 F.2d at 171-73.

Joint and several liability under § 107(a) is not automatic, however. Recognizing Congress' intent that "traditional and evolving common law principles" should define the scope of liability under CERCLA, courts have looked to the Restatement (Second) of Torts, particularly § 433A, for guidance. *In re Bell Petroleum Servs., Inc.,* 3 F.3d 889, 895 (5th Cir.1993); *accord United States v. Alcan Aluminum Corp.,* 964 F.2d 252, 268 (3d Cir.1992); *Monsanto,* 858 F.2d at 172. This section provides:

> (1) Damages for harm are to be apportioned among two or more causes where

> (a) there are distinct harms, or
>
> (b) there is a reasonable basis for determining the contribution of each cause to a single harm.
>
> (2) Damages for any other harm cannot be apportioned among two or more causes.

Restatement (Second) of Torts § 433A (1965). Consequently, courts will not hold a defendant jointly and severally liable to a governmental or non-liable private plaintiff where the defendant can demonstrate the harm at a given site is "divisible," *i.e.,* there are distinct harms or a reasonable basis for determining the contribution of each cause to a single harm. *Bell Petroleum,* 3 F.3d at 904; *Alcan Aluminum,* 964 F.2d at 268-69; *United States v. Chem-Dyne Corp.,* 572 F.Supp. 802, 810 (S.D.Ohio 1983). When a defendant successfully demonstrates the harm at the site is divisible, it will only be held liable for that portion of the cleanup costs attributable to its conduct. *Alcan Aluminum,* 964 F.2d at 269; *Chem-Dyne,* 572 F.Supp. at 810.

While the "divisibility" defense to joint and several liability is frequently invoked in cost recovery actions brought under § 107(a), it is not a defense to a contribution action under § 113(f). In contrast to a § 107(a) action, a contribution claim under § 113(f) is a means of equitably allocating response costs among responsible or potentially responsible parties. *See* S.Rep. No. 11, 99th Cong., 1st Sess. 44 (1985). Thus, when one liable party sues another liable party under CERCLA, the action is not a cost recovery action under § 107(a). Rather, it is a claim for contribution under § 113(f). *See United States v. Colorado & E.R. Co.,* 50 F.3d 1530, 1535-36 (10th Cir.1995); *Amoco Oil Co. v.*

*Borden, Inc.,* 889 F.2d 664, 672 (5th Cir.1989). Whereas joint and several liability is the rule for defendants in actions under § 107(a), courts in contribution cases may "allocate response costs among liable parties." *See* 42 U.S.C. § 9613(f)(1). This could include allocating some response costs to the plaintiff. Since there is no joint and several liability among defendants in a contribution action, the divisibility defense has no relevance as a "defense" in these cases.[32]

As we noted at the outset of our discussion, Redwing's CERCLA claims against the Appellees are claims for contribution governed by § 113(f). This is true as well for the Appellees' CERCLA counterclaims. The divisibility defense is therefore not at issue in this case. Once the district court determines who are responsible parties under § 107(a), the next step under § 113(f) is to equitably allocate responsibility among the parties. Divisibility of the harm at the Saraland Site is not a prerequisite to making this allocation.

IV. CONCLUSION

Noting "the essential policy underlying CERCLA is to place the ultimate responsibility for cleaning up hazardous waste on those responsible for [the] problems cause by the disposal of chemical poison," the district court held Redwing responsible for the entire cost of cleaning up the Saraland Site. *Redwing Carriers,* 875

---

[32]This is not to say the ability of the court, with the assistance of the parties, to distinguish among separate harms caused by different parties at a site is irrelevant in allocating response costs under § 113(f). This is unquestionably an "appropriate" factor for a court to consider in making a fair division of liability.

F.Supp. at 1569 (citations and quotation marks omitted). While we agree Redwing must bear its fair share of the cost of remedying a condition it largely created, the district's court's holding was premature. We affirm the court's grant of summary judgment in favor of the Hutton partners. And with the exception of Redwing's partnership law claims against Coit and Roar, we affirm summary judgment for the general partners as well. As to Marcrum, we affirm summary judgment on Redwing's claims premised on subsections 107(a)(2) and (a)(3). We reverse, however, on Redwing's operator claim against Marcrum based on subsection 107(a)(1). We likewise find there are genuine issues of material fact precluding summary judgment on Redwing's arranger claim against Meador. If Marcrum and/or Meador are found to be responsible parties under § 107(a) of CERCLA, then the district court must consider their roles and circumstances in allocating costs under § 113(f).

AFFIRMED in part, REVERSED in part, and REMANDED.