[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

No. 05-12204

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 6, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00614-CV-J-20-MMH

ATLANTA GAS LIGHT COMPANY,
a Georgia corporation,

                                   Plaintiff-Appellant,

versus

UGI UTILITIES, INC, et al.,
a Pennsylvania corporation,
CENTERPOINT ENERGY RESOURCES CORPORATION,
a Delaware corporation,
CENTURY INDEMNITY COMPANY,
a Pennsylvania corporation,

                                   Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(September 6, 2006)**

Before ANDERSON, DUBINA and HILL, Circuit Judges.

ANDERSON, Circuit Judge:

This case involves an attempt to seek contribution for environmental clean-up costs from the parent corporations of previous owners of a pollution-causing facility. There is an additional attempt to prove coverage under three insurance policies.

## I. FACTS AND PROCEDURAL BACKGROUND

The City of St. Augustine discovered the environmental contamination at issue when it, the current owner, sought to redevelop the site into a mixed use and marina complex. The EPA identified Atlanta Gas Light Company ("AGLC") and the City as "responsible parties" under CERCLA. 42 U.S.C. § 9601 et seq. Both parties negotiated with the EPA and entered into orders to investigate and then to clean up the site. AGLC now brings this suit seeking contribution from the defendants.

AGLC was the most recent previous owner of the St. Augustine manufactured gas plant ("MGP") that was formerly located on the site. This MGP began operation in 1886, using a new technology that involved superheating raw materials, such as coal, oil or pine knots, to produce a combustible gas. During this process, the MGP produced several by-products, such as coal tar, which in recent times have been recognized as containing toxic materials. AGLC argues that these

2

by-products were released into the ground throughout the operating history of the plant. When the MGP was shut down, the below-grade structures were simply buried and the property was converted to other uses.

The St. Augustine Gas and Electric Light Company ("St. Augustine Gas") was incorporated in 1887. AGLC argues that defendant UGI Utilities' predecessor[1] directed operations from then until 1928. UGI was a minority shareholder in St. Augustine Gas during this period, but nominated most of the local superintendents for the MGP and provided services to St. Augustine Gas, its subsidiary (as described more fully below). Senior UGI executives occupied several board and officer slots for St. Augustine Gas.

In 1928, defendant CenterPoint Energy Resources Corporation's predecessor[2] acquired the stock of St. Augustine Gas. It replaced all of the board of directors with senior CenterPoint executives. Two years later, it entered into "management" and engineering contracts with St. Augustine Gas (discussed more fully below). In 1935, CenterPoint assigned its contracts to a newly formed, mutual management corporation owned by CenterPoint subsidiaries. CenterPoint

---

[1] UGI is the successor of United Gas Improvement Company and The United Gas Improvement Company, all of which are referred to herein as UGI.

[2] CenterPoint is the successor to American Gas & Power Company, both of which are referred to herein as CenterPoint.

continued to indirectly own 100% of St. Augustine Gas stock but because the management clearly was out of CenterPoint's hands, AGLC does not contend that CenterPoint is responsible after 1935.

From 1940 to 1947, defendant Century Indemnity Company's predecessor[3] provided three liability insurance policies to St. Augustine Gas. The insurance policies covered accidents, and AGLC contends that there were daily leaks and spills that would constitute accidents.

After AGLC entered into the settlement with the EPA, it sent demand letters to UGI and CenterPoint, the alleged former operators of the site. Both refused to participate in either the investigation or clean-up. After most of the clean-up was completed, AGLC sued UGI, CenterPoint and Century Insurance under CERCLA, seeking contribution. The Defendants moved for summary judgment, which the district court granted.

The district court reasoned that AGLC sought to impose liability on the utility defendants only on the basis of their operation of the facility (not on the basis of ownership), but had not put forth enough evidence for a jury conclude that either UGI or CenterPoint had operated the plant. After an examination of the

---

[3] Century Indemnity Company is the successor to Indemnity Insurance Company of North America Philadelphia.

4

record evidence, the district court determined that neither of the utility defendants' relationships with the plant fell within the test outlined by the Supreme Court in United States v. Bestfoods, 118 S.Ct. 1876 (1998).  Turning to the claims against Century, the court first held that Century was not liable under the first two insurance policies because they were issued to AGLC's predecessor and because they contained no-assignment clauses which blocked coverage for AGLC.   The third policy, however, covered a later period and AGLC acquired ownership of this policy via a statutory merger.  Order at 36.  That policy covered the period from February 1, 1946 to February 1, 1947.  The court held that even assuming a leak could be an accident, AGLC did not adduce enough evidence to establish a question of material fact that a leak occurred during that period.  Id. at 37.  AGLC's expert had testified that leaks likely occurred during the operation of the plant; UGI's expert characterized AGLC's expert's method as "far too speculative" and as having "no firm grounding in science."  Id.  The court agreed, holding that to find that leaks occurred during that particular year would require naked guesses. Id. at 37-38.

## II.  DISCUSSION

### A.  Jurisdiction

Before we address the merits of this case, we must address UGI's argument

that we lack jurisdiction over this case under CERCLA.  UGI cites <u>Cooper</u>

<u>Industries v. Aviall Services</u>, 543 U.S. 157 (2004), where the Court held that

companies could not bring actions for contribution under §113(f)(1)[4] unless they

had been sued under §107 or §106 themselves.  However, as the Second Circuit in

a post-<u>Cooper</u> case noted, it was possible for a party that settled to bring an action

under §113(f)(3)(B)[5] if the settlement covered CERCLA claims.  <u>Consolidated</u>

<u>Edison Co. of N.Y. v. UGI Util.</u>, 423 F.3d 90, 95 (2d Cir. 2005).  See also Cooper,

543 U.S. at 167, 125 S.Ct. at 584 (indicating in dicta that § 113(f)(3)(B) provides

---

[4]     Section 113(f)(1) provides:

Contribution
Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

[5]     Section 113(f)(3)(B) provides:

(C) In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.

6

an avenue for contribution "after an administrative or judicially approved settlement that resolves liability to the United States or a state."). Here, AGLC settled and the settlement covered CERCLA claims. We note incidentally that AGLC did not specify in its complaint a particular subsection of §113 under which it was bringing its claims. Thus, we readily conclude that we have jurisdiction under §113(f)(3)(B).

B. The Bestfoods Standard.

In United States v. Bestfoods, 524 U.S. 51, 118 S.Ct. 1876 (1998), the Supreme Court recognized that liability for environmental clean-up can be imposed either on an "owner" or on an "operator." In a situation involving an attempt to impose liability on a parent because its subsidiary owns a pollution-causing facility, the parent can be subjected to liability as an owner if the corporate veil can be pierced. AGLC does not argue in this case that either UGI or CenterPoint are liable as an owner, and does not seek to pierce the corporate veil. Rather, AGLC seeks to impose liability on these defendants as "operators."

In discussing the operations sufficient to constitute direct "operation" by a parent of its subsidiary's facility, and thus impose liability upon the parent, the Court was sensitive to avoid a fusion of direct liability as an "operator" and the

7

indirect liability of an "owner."  Thus, the test of parental operation turns upon "whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary."  Id. at 68, 118 S.Ct. at 1887.  In evaluating a parent's activities with respect to its subsidiary, it is relevant whether or not corporate norms are observed.   Id. at 71, 118 S.Ct. at 1889.  For example, the Court expressly held that overlapping officers and directors is not sufficient to expose a parent to liability for its subsidiary's actions.  Id. at 69, 118 S.Ct. at 1888.  Indeed, the Court established a presumption that the "officers and directors [of the subsidiary] were acting in their capacities as . . . officers and directors [of the subsidiary]," and not of the parent.  Id. at 70, 118 S.Ct. at 1888.   The Court ultimately articulated the following test:  To impose liability upon a parent as an "operator" under CERCLA with respect to a pollution-causing facility owned by a subsidiary, a plaintiff must prove that the parent as operator must have "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  Id. at 66-67, 118 S.Ct. at 1887.[6]

_____

[6]     The Court set forth three "routes" of potential liability of a parent as an operator: first "when the parent operates the facility instead of its subsidiary or alongside the subsidiary in some sort of joint venture," id. at 71, 118 S.Ct. at 1889; second, "a dual officer or director might

C.  The Claims Against UGI

To make its case against UGI, AGLC points to UGI's supervision of the plant through its centralized committees, the UGI management contracts with St. Augustine Gas, and the fact that UGI personnel occupied the majority of the director and officer positions at St. Augustine Gas.  It also points out that UGI nominated substantially all of the local superintendents and regularly approved their salaries. Finally, AGLC notes that UGI received a fee for providing the services described in the contract and pursuant to the practices preceding the contract.

The Court in Bestfoods instructed that activities of a parent with respect to its subsidiary consistent with corporate norms should not give rise to liability under CERCLA.  Here, there is nothing unusual about the existence of overlapping

---

depart so far from the norms of parental influence exercised through dual office holding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility," id.; and third, "an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility," id.   In this case, AGLC purports to proceed primarily under the first route.  We agree that no liability could be imposed under either of the other two routes.  There is no evidence of the required departure from corporate norms.  Similarly, there is insufficient evidence under the third route.  AGLC's reliance upon the activities of Patterson is without merit.  His service as general manager of the St. Augustine Gas facility in 1926 was clearly as an employee of the subsidiary, and not on behalf of UGI.  There is very little evidence of activity of either UGI or CenterPoint employees (having no position with the subsidiary), and no evidence of such persons acting so as to manage, direct or conduct operations specifically related to leakage or disposal of hazardous waste.

9

officers and directors.  Indeed, <u>Bestfoods</u> expressly holds that this is not sufficient to impose liability on a parent.  <u>Id.</u> at 71-72, 118 S.Ct. at 1889.  Similarly, it is not abnormal in the corporate world for a parent to receive a fee of the kind involved here, or to approve key salaries of a subsidiary.

Our review of the record persuades us that the "management" contract between the two entities (which apparently was executed in the later years of the relationship) reflects the nature of the relationship all along.  The contract explains the relationship between the two entities as being based on St. Augustine's ability to tap into UGI's vast knowledge and resources.  There is nothing in the contract that suggests that UGI was contracting to actively manage the St. Augustine facility itself; rather, the contract allows St. Augustine to receive advice from UGI's various skilled personnel, to have access to UGI's network of professionals, and in general to benefit from access to UGI's vast experience.  For example, in Article I, St. Augustine Gas retained UGI "as its general operating, construction and financial <u>advisor</u>."  Throughout the contract, its contemplation was that UGI would provide <u>recommendations</u> to St. Augustine Gas.  The only exception was that UGI would actually serve as St. Augustine's purchasing agent for significant

purchases requested by St. Augustine.[7]  Most significant for this case, there is nothing in the contract that suggests that UGI's consultation work involved leakage or disposal of hazardous waste, much less any suggestion that UGI would be actually involved in operations involving leakage or disposal of hazardous waste. In other words, in the language of Bestfoods, nothing in the contract suggests that UGI was to "manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste." Id. at 66-67, 118 S.Ct. at 1887.  Similarly, there is nothing in the record suggesting that, prior to the time of such a contract between the two entities, UGI was engaged in such activities.  To the contrary, the record suggests a similar advisory role.[8] Finally, to the extent that Kingsley Patterson, who apparently was normally an UGI employee, managed the plant for a short while, he was appointed acting

---

[7]    The fee to be paid to UGI for such advice was (in the year 1927) $4,000, plus the actual cost of special or extraordinary services, plus ten percent of increased earnings.

[8]    AGLC's argument that UGI's centralized committees actually operated the facility is simply not supported in the record.  The committee personnel were located in Philadelphia, and the record suggests that their activities were in the nature of rendering advice and consultation primarily from that distance, with more occasional on-site visits.  The record also indicates that the committees provided such advice to numerous similar facilities in which UGI had a similar equity interest.   Significantly, AGLC has pointed to no evidence indicating that even such advice and consultation involved operations specifically related to leakage or disposal of hazardous waste.   Id.

AGLC makes much of the word "order" used in committee minutes.  However, such use was in the context of approving substantial expenditures.  The supervision of a subsidiary's capital expenditures falls within corporate norms.  Id. at 72, 118 S.Ct. at 1889.

11

superintendent during that period, and thus is presumed to have been working on behalf of St. Augustine Gas, not UGI.  Id. at 69-70, 118 S.Ct. 1888.  His testimony that he "practically rebuilt the plant in 1926" refers to that period during which he replaced an ill superintendent; he is presumed to have been working on behalf of St. Augustine Gas.  In sum, AGLC had pointed to nothing in the record that would support a finding that UGI operated the St. Augustine plant, let alone operated the pollution-causing sources.

For the foregoing reasons, we agree with the district court and conclude that a reasonable jury could not find from this record that UGI managed, directed or conducted operations of the St. Augustine facility specifically related to pollution, leakage, or disposal of hazardous waste.  Accordingly, the judgment of the district court with respect to UGI is due to be affirmed.


D.  The Claims Against CenterPoint

Turning to the claims against CenterPoint, AGLC argues that CenterPoint assumed the same relationship with St. Augustine Gas when it acquired all of the company's stock in 1928.   In support of its claim against CenterPoint, AGLC argues that CenterPoint replaced the St. Augustine Gas officers and directors with CenterPoint senior executives and entered into a contract to "manage" St.

Augustine Gas; AGLC also points to testimony from CenterPoint employees Alver Traver and Kingsley Patterson.[9]

Looking at the facts through the prism of corporate norms, as required by Bestfoods, it is clear that AGLC has not adduced enough evidence of CenterPoint's management of the plant to hold it liable for clean-up costs under CERCLA. As mentioned in the context of UGI, the existence of overlapping officers and directors is not inconsistent with corporate norms. Turning to CenterPoint's two contracts, it is clear that the services they contemplate are not in the nature of operating the plant itself and its polluting capacity. The first contract covers engineering which in turn is divided into consulting engineering and designing/supervising engineering. The descriptions of the engineering work to be done contemplates general engineering advice and assistance on proposed additions, extensions and alterations, and design, supervision and construction on substantial additions, extensions and alterations. It does not contemplate operation of the plant. Additionally, the contract reads: "The services above described are intended to cover work as listed which can be handled most efficiently and

---

[9]     Patterson, who had previously been employed by UGI, apparently began a similar association with CenterPoint. Patterson and Traver both testified in 1942 before the Securities and Exchange Commission. AGLC points to excerpts from that testimony in support of its claims against both utility defendants.

13

economically by engineers, leaving to local operating forces such work as they are qualified to do." While the contract does include a heading entitled "Miscellaneous Engineering," that is defined as any engineering services not mentioned in the delineated engineering descriptions. At least in the absence of any evidence that CenterPoint's engineering activities actually involved operating activities related to leakage or disposal of hazardous waste, this is not enough upon which to base a holding that CenterPoint managed or directed "operations specifically related to . . . leakage or disposal of hazardous waste." Bestfoods, 524 U.S. at 66-67, 118 S.Ct. at 1887.

Although the other CenterPoint contract is labeled a "management" contract, the details of the contract reveal that it contemplates a relationship very similar to UGI's relationships with its numerous subsidiaries (as AGLC itself acknowledges). The details of the CenterPoint contract reveal that it contemplates activities in the nature of advice and consultation. For example, the contract indicates that CenterPoint will nominate directors or officers at the request of the company. However, the contract contemplates that the local officers, and not CenterPoint, will operate the plant: "These officers . . . will supervise and direct the management of the operations of the company." As noted above, it is presumed that such local office holders are acting on behalf of the subsidiary, and not the parent. Although

purchasing, preparation of tax returns and a few other administrative matters were to be centralized, the bulk of the "management" services contemplated by the contract consisted of advice and assistance. For example, with respect to technical services, the contract contemplated "general engineering advice and assistance on special technical problems." The advisory and consultative nature of CenterPoint's services was also indicated by the testimony of Traver, apparently an officer of CenterPoint and/or one or more of its subsidiaries. Traver testified that he was the "sponsor" and "engineer" for the St. Augustine Gas plant during the relevant time. Traver was living and working in Jacksonville and serving as general manager of CenterPoint's Jacksonville plant, which paid at least part of his salary. However, in addition to his Jacksonville job, he indicated that he simultaneously served CenterPoint, acting as "sponsor" and engineer for 40 other subsidiaries of CenterPoint, including St. Augustine. He described his role in a manner consistent with the above description of the contracts. With respect to his duties for St. Augustine, he testified that he consulted by telephone with the local management in St. Augustine, sometimes twice a day, sometimes once a week, or about an average of 3-4 times per week. He testified that he made an on-site visit to the St. Augustine plant approximately 6-7 times a year, or perhaps a few more. It is clear from his testimony, and from the totality of the evidence in this record, that

15

CenterPoint did not operate the St. Augustine facility itself, and certainly did not "manage, direct or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste." Bestfoods, 524 U.S. at 66-67, 118 S.Ct. at 1887. For the foregoing reasons, we agree with the district court and conclude that a reasonable jury could not find from this record that CenterPoint managed, directed or conducted operations of the St. Augustine facility specifically related to pollution, leakage or disposal of hazardous waste. Accordingly, the judgment of the district court with respect to CenterPoint is due to be affirmed.[10]

---

[10] Our conclusion is consistent with the conclusions of the court in Consolidated Edison Co. v. UGI Utilities, 310 F. Supp.2d 592 (S.D.N.Y. 2004), aff'd, 153 F. App'x 749 (2d Cir. 2005). Our previous opinion in Redwing Carriers, Inc. v. Saraland Apartments, 94 F.3d 1489 (11th Cir. 1996), does not indicate a different result with respect to either UGI or CenterPoint. In that case, this court did conclude that the activities of Marcrum Management Company in managing the apartment complex were sufficient to impose CERCLA liability upon it as an "operator." However, in so holding we found that Marcrum Management Company was "responsible for the daily management of the [apartment] complex." Id. at 1509. For example, it received complaints from tenants and controlled the content and method of the response, id. at 1509-10, and had "been partly responsible for remedying tar seeps [the contaminant at issue]," id. at 1510. The court characterized these and other activities of Marcrum Management Company as "having a hand in . . . routine operations of the complex." Id. In other words, Redwing is readily distinguished from this case. Unlike either UGI or CenterPoint, Marcrum Management Company was engaged in the day-to-day operations of the apartment complex and actually handled activities specifically related to disposal of hazardous waste. We note that Redwing predated Bestfoods. Because Redwing is distinguishable from the instant case, we need not decide whether its analysis is consistent with the now-controlling analysis set forth in Bestfoods.

16

E. Claims Against Century

At issue in the claim against Century is coverage under three insurance policies issues by Century covering the periods 1940-43, 1943-44, and 1946-47 (i.e., a total of five years). To prove coverage under the policies, AGLC has to prove injury to property "caused by accident." The term "accident" is not further defined in the policy.

Before exploring the scope of such accident coverage, we review the evidence adduced by AGLC. In this regard, we note that the district court held, at least with respect to the 1946-47 policy period, that the record shows no specific instances of contamination during that period. We agree, and we believe that the same absence of evidence is true with respect to the entire five-year time span encompassed by the three policies. During that entire five-year period, AGLC has pointed to no evidence indicating a spill or disposal of hazardous materials, or any other specific instance of a release of contaminants. Nor has AGLC pointed to any specific instance during that time frame of a replacement, alteration, or even maintenance of equipment (which might have been an occasion during which discharges or spillage of contaminants from such machines might have occurred).[11]

---

[11]     Neither the district court nor this court has an obligation to parse a summary judgment record to search out facts or evidence not brought to the court's attention. Notwithstanding this, we have reviewed sufficient portions of the record to give us comfort that

17

We need not decide whether any of the foregoing might constitute "accidents" under the insurance policies, because there is simply no evidence of such spills or discharges. Indeed, AGLC does not assert that there is any evidence of any of the foregoing. Rather AGLC relies upon the report and testimony of its expert, Dr. Shifrin, to the effect that leakages from equipment typically used at MCP plants must necessarily have occurred during a time span as long as the five years at issue here. Dr. Shifrin expressed the opinion that such leakages were routine for equipment of that type, and were an unavoidable reality. The district court held that such testimony left the jury with no way to know at what time the equipment began leaking, how long it leaked, or at what rate. The district court held that such evidence was far too speculative upon which to base a jury verdict. We need not decide whether the district court is correct in this regard, because we conclude that any such routine leakage would not constitute an event "caused by accident," and thus would not be covered under the insurance policies.

We accept the definition of "accident" which was proposed by AGLC in the district court – an unintentional and unexpected event. See State Farm Fire & Casualty Co. v. CTC Development Corp., 720 So.2d 1072, 1076 (Fla. 1998)

able counsel have not overlooked significant evidence in their briefs to the district court and this court.

18

(establishing the meaning of the term "accident" when the term is not defined in the insurance policy, and holding that the term means not only "accidental events," but also injuries neither expected nor intended from the standpoint of the insured). We cannot conclude that AGLC has proved[12] that the routine leakages referred to in Dr. Shifrin's testimony were either unintended or unexpected. With respect to the former, experts called by the defense testified without contradiction that the industry was aware of this leakage problem well before the time span at issue here. For example, there was wide discussion of the leakage problem in the industry literature. In addition, nuisance lawsuits had brought the matter to the attention of the industry. Moreover, there was uncontradicted evidence that the industry was aware of the problem, because the byproducts – which are in modern times deemed to contain hazardous contaminants – were that at that time valuable byproducts which could be reused by the facility or sold for a profit. In other words, there was ample incentive on the part of the industry to detect, minimize and prevent such leakages in order to profit from the recovered byproducts. In the face of this evidence indicating that the owners of St. Augustine Gas would have been aware of such leakage problems, AGLC has pointed to no evidence that the owners of the St.

---

[12] Because the policies at issue insure only injuries to properly "caused by accident," the burden of proof is on the insured. In other words, the issue in this case does not turn on proof with respect to an exclusion from coverage.

19

Augustine facility were unaware of the leakage problem during the early 1940s.[13]

We also conclude that AGLC has clearly failed to prove that such leakages were unexpected. Indeed, the only evidence of any leakages at all during the relevant five years, is AGLC's evidence that such leakages are to be expected when equipment of this general type is used.[14]

Our conclusion that such routine and unavoidable leakages are not accidents under insurance policies such as the ones at issue here finds support in Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp., 636 So.2d 700 (Fla. 1993). That case involved an insurance policy providing liability coverage for damage to property caused by an occurrence, defined as an accident including continuous or repeated exposure to conditions, but excluding pollution injuries unless the discharge is sudden and accidental. Id. at 702. With respect to the meaning of accidental, the court held it is generally understood to mean unexpected and

---

[13] Although Dr. Shifrin testified that some operators of similar equipment may not have been aware that the equipment was leaking (because some of it was underground), that does not constitute evidence that the owners of St. Augustine Gas were unaware. Indeed, there was evidence that the owners received inspection reports at about this time frame, revealing observable evidence of past leakages. The only sense in which it might be considered unintended is that such leakages might have been unavoidable at reasonable costs.

[14] In addition to this common sense logic, we discussed immediately above the ample evidence in the record that the industry was well aware of the fact of such leakages, and thus would have expected such injuries to the real property. Although the CERCLA liability was probably unexpected during the early 1940s, the alleged injury to this real property – i.e., the alleged routine leakage of coal tar into the ground – was not unexpected, as demonstrated above.

unintended.  In this regard, the court quoted and approved of another court's holding that spills and leaks cannot be classified as unexpected or accidental when they are commonplace events occurring in the course of daily business.  Id. at 705.[15]

For the foregoing reasons, we conclude that the district court did not err in granting summary judgment in favor of Century.

### III. CONCLUSION

In summary, we conclude for the reasons above set out that the district court properly entered summary judgment for all three defendants.

**AFFIRMED.**

---

[15]    The Supreme Court of Florida, both in State Farm v. CTC Development and Dimmitt, explained the evolution of the language in comprehensive liability insurance policies, and how the more recent "occurrence" language broadened coverage as compared to the older "caused by accident" policies, although that broadening effect was still later modified somewhat by the addition of a pollution exclusion unless the discharge is sudden and accidental.  As indicated in the text, Dimmitt involved the newer "occurrence" language with the partial pollution exclusion.  It is unclear how much broader (if any) the coverage provided by such later Dimmitt-like policies is as compared to the old "caused by accident" policies; however, it is clear that a "caused by accident" policy, as in this case, provides coverage at least as narrow as a Dimmitt-like policy.  Thus, if routine or commonplace events occurring in the course of daily business are not unexpected and accidental under a Dimmitt-like policy, then such events are a fortiori not unexpected and not accidental under the "caused by accident" policies in this case.